THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>RAQWON SLADE,<br><br>　　　　　　Defendant. | CASE NO. CR18-0307-JCC<br><br>ORDER |

This matter comes before the Court on Defendant's motion to suppress and to dismiss the indictment (Dkt. No. 19). Having thoroughly considered the parties' briefing and the relevant record, and having heard testimony, the Court hereby DENIES the motion for the reasons explained herein.

## I. BACKGROUND

The following factual findings are based on the testimony of King County Sheriff's Office Sergeant Timothy Sigel (hereinafter "Sgt. Sigel") and Defendant Raqwon Slade (hereinafter "Slade") elicited during a hearing before the Court on May 21, 2019. The Court found Sgt. Sigel's testimony to be more credible than Slade's testimony.

In the early morning hours of December 2, 2018, Sgt. Sigel was on patrol parked outside of a large shopping complex in Fairwood, Washington. Sgt. Sigel is a 30-year veteran of the King County Sheriff's Office, who has primarily spent his career working patrol. That morning,

Sgt. Sigel was alone and driving a marked police car. The shopping complex has several stores and restaurants, including a Safeway, Ace Hardware, and McDonald's. At that time, every business was closed except the Safeway, which was not visible from the area of the parking lot where Sgt. Sigel was located. Sgt. Sigel did not see any other cars in the parking lot.

At around 2:55 a.m., Sgt. Sigel saw an adult male, later identified as Slade, standing in front of the entrance to Ace Hardware. Sgt. Sigel did not see anyone else in the immediate area. Sgt. Sigel watched Slade for about three to five minutes. During this time, Slade repeatedly disappeared from Sgt. Sigel's view by walking behind a cage of propane tanks in front of the store. Sgt. Sigel was parked approximately 50 to 75 yards from Slade's location, and Sgt. Sigel could not see what Slade was doing.

At approximately 2:58 a.m., Sgt. Sigel radioed to dispatch that he was going to contact Slade.[1] As he drove closer, Sgt. Sigel saw Slade urinating on a pillar in front of Ace Hardware. As Sgt. Sigel drove up to Slade, he began to walk away. Sgt. Sigel got out and told Slade to walk over to his patrol car three times. Sgt. Sigel testified that Slade looked like he was going to run. Sgt. Sigel stepped into Slade's path and asked Slade if he had identification. Slade responded by reaching his right hand toward his right front waistband.[2] Sgt. Sigel was standing behind Slade and could not see Slade's right hand when he reached for his waistband. Sgt. Sigel told Slade to show his hands and to not reach for his waistband.

Slade testified that he complied with Sgt. Sigel's request to show his hands by putting both of his hands up in the air. Notwithstanding Sgt. Sigel's command, Slade stated that he again reached down to get his identification. Sgt. Sigel testified that Slade was not reaching for his back pocket, but toward his right front waistband. Sgt. Sigel drew his sidearm and held it at the low ready, pointed toward the ground. Sgt. Sigel ordered Slade to put his hands on the patrol car.

---

[1] Sgt. Sigel's transmissions to dispatch were memorialized in a computer aided dispatch ("CAD") log, produced as an exhibit during the hearing. (*See* Dkt. No. 23-1.)

[2] Slade testified that he was reaching for his identification, which was in his back pocket.

Slade complied and put both hands on the patrol car.

Sgt. Sigel testified that Slade again reached for his right front waistband with his right hand. Sgt. Sigel responded by repeatedly telling Slade to show his hands. When Slade failed to show his hands, Sgt. Sigel pushed Slade against the patrol car and again ordered him to show his hands. Sgt. Sigel testified that Slade again reached for his right front waistband, at which point Sgt. Sigel pointed his sidearm at Slade's head and ordered him to show his hands.[3]

After Slade placed his hands on the patrol car again, Sgt. Sigel grabbed Slade's right arm and patted down the right front waistband area where Slade had been reaching. Sgt. Sigel immediately felt what he believed to be the butt of a handgun tucked into Slade's waistband. Sgt. Sigel removed a loaded .45 handgun from Slade's front right waistband and placed Slade in handcuffs. Approximately two minutes elapsed between the time Sgt. Sigel made contact with Slade and the time Slade was in handcuffs.

A subsequent records check revealed that Slade was a convicted felon. Slade was ultimately indicted on one count of being a felon in possession of a firearm. (Dkt. No. 1.) Slade moves to suppress the handgun and to dismiss the indictment. (Dkt. No. 19.)

## II. DISCUSSION

### A. Motion to Suppress

Slade argues that the handgun should be suppressed for four separate reasons. First, Slade asserts that Sgt. Sigel lacked reasonable suspicion to conduct a *Terry* frisk. (Dkt. No. 19 at 5.) Second, Slade asserts that Sgt. Sigel's actions transformed what began as an investigatory detention into an arrest that lacked probable cause. (*Id.* at 7.) Third, Slade asserts that Sgt. Sigel used excessive force in violation of the Fourth Amendment. (*Id.* at 8.) Fourth, Slade argues that

---

[3] Slade testified that during this exchange he was holding his cellphone and called and spoke with a friend. Slade also testified that Sgt. Sigel allowed him to make the call. Sgt. Sigel did not testify about Slade having a phone or allowing him to make a call.

ORDER
CR18-0307-JCC
PAGE - 3

Sgt. Sigel's use of force was so shocking that it violated his substantive due process rights. (*Id.* at 9.) The Court discusses each of Slade's suppression arguments in turn.

### 1. *Terry* Frisk

A *Terry* frisk is a limited exception to the Fourth Amendment's general requirement that an officer must have probable cause before conducting a search. *Terry v. Ohio*, 392 U.S. 1, 24 (1968). In *Terry*, the Supreme Court held that an officer may conduct a brief pat-down of an individual when the officer reasonably believes that "the [person] with whom he is dealing may be armed and presently dangerous." *Id.* To determine whether a *Terry* frisk is permissible, the court asks "(1) whether the officer's action was justified at its inception, and (2) whether the officer's action was confined in scope by engaging in a carefully limited search of the outer clothing . . . in an attempt to discover weapons which might be used to assault an officer." *United States v. I.E.V.*, 705 F.3d 430, 435 (9th Cir. 2012) (internal quotation marks omitted) (citing *Terry*, 392 U.S. at 20, 39–30). To justify a *Terry* stop, an officer must be able to point to "specific and articulable facts" that indicate something more than a general "governmental interest in investigating crime." *Terry*, 392 U.S. at 21, 23. The test is an objective one, which asks whether "a reasonably prudent [officer] in the circumstances would be warranted in the belief that his safety or that of others was in danger." *I.E.V.*, 705 F.3d at 439.

It is undisputed that Sgt. Sigel had a valid basis to stop Slade after he saw Slade urinating in public. Urinating in public is a class 2 civil infraction that carries a maximum fine of $125. King County Code § 12.58.010. Under Washington law, a person suspected of committing a civil infraction is required to identify himself or herself to the investigating officer and provide identification upon request. Wash. Rev. Code § 7.80.060. The statute also allows a police officer to detain a person for "no longer than is reasonably necessary to identify the person for the purpose of issuing a civil infraction." *Id.* Sgt. Sigel contacted Slade after he witnessed him urinating outside of Ace Hardware. At that point, Sgt. Sigel was entitled to stop Slade, ask him for identification, and detain him for a reasonable time to identify him prior to issuing a civil

infraction. *See* Wash. Rev. Code § 7.80.060.

Having found a valid basis for the stop, the Court must decide whether Sgt. Sigel had a specific and articulable basis to believe Slade was armed and dangerous prior to conducting a *Terry* frisk, and whether Sgt. Sigel's frisk was sufficiently limited in scope. Slade argues that Sgt. Sigel lacked an articulable basis to conclude that Slade was armed and dangerous because: (1) Slade was not engaging in criminal activity, much less a violent crime; and (2) Slade only reached for his waistband in order to comply with Sgt. Sigel's request to produce identification. (Dkt. No. 19 at 5.)

The Court concludes that, under the totality of the circumstances, a reasonably prudent police officer in Sgt. Sigel's position would be warranted in the belief that his safety was in danger. The surrounding circumstances presented heightened safety concerns—it was the dead of night, Sgt. Sigel was working alone, and there were no other people or cars in the immediate area. Although Sgt. Sigel did not observe Slade engaged in criminal activity, Sgt. Sigel did observe what appeared to be, at a minimum, suspicious activity—Slade was walking around alone in front of a closed business for at least several minutes. As Sgt. Sigel approached, Slade began walking away, and Sgt. Sigel told Slade three times to walk over to his patrol car because he was acting like he was going to run.

These circumstances and observations, standing alone, would not warrant a *Terry* frisk. Rather, Slade's repeated non-compliance with Sgt. Sigel's commands to keep his hands in view made a limited search objectively reasonable. When Sgt. Sigel initially asked Slade if he had identification, it was reasonable for Slade to reach down to his waistband—such an action should be expected from a person attempting to produce identification. Again, had Sgt. Sigel conducted a *Terry* frisk at that point, he would have acted unreasonably.

But the undisputed testimony was that Slade reached down to his waistband after Sgt. Sigel ordered him to keep his hands in view. Sgt. Sigel did not tell Slade to produce identification; he ordered him to show his hands. While there was conflicting testimony

regarding the number of times Slade reached down to his waistband, Slade himself admitted on cross-examination that, notwithstanding Sgt. Sigel's directives, he did so at least once.

Sgt. Sigel also testified about the specific safety concerns he had with Slade reaching for his waistband. From where Sgt. Sigel was standing, he could not see Slade's right hand when he reached down to his waistband. Sgt. Sigel testified that in his experience as a police officer, people often carry handguns in the front of their waistbands. He also testified that in his experience men often carry their identification in their back pockets. In other words, Sgt. Sigel had an articulable basis to be concerned for his safety when Slade continued to reach for the front of his waistband after being order not to. *United States v. Mattarolo*, 209 F.3d 1153, 1157 (9th Cir. 2000) ([An] officer's training and experience are factors to consider in determining if the officer's suspicions were reasonable."). Further, Sgt. Sigel did not pat-down Slade's waistband until after he had refused to comply with Sgt. Sigel's commands. Therefore, the search was valid at its inception.

Sgt. Sigel's *Terry* frisk was also a carefully limited search of Slade's outer clothing made in an attempt to discover weapons. Sgt. Sigel testified that he patted-down the top of Slade's waistband where he had been reaching and immediately felt the butt of a handgun. Sgt. Sigel's frisk was limited to the area for which he had an articulable safety concern, and towards which Slade continued to reach. Moreover, the testimony did not suggest that Sgt. Sigel manipulated the handgun in a way that would have exceeded the limits of a valid *Terry* frisk. *See Minnesota v. Dickerson*, 508 U.S. 366 (1993). For the foregoing reasons, the Court finds that Sgt. Sigel had a reasonable basis to conclude that Slade was armed and dangerous prior to performing a limited *Terry* frisk for the purpose of ensuring officer safety. Slade's motion to suppress is DENIED on this ground.

2. <u>Investigatory Stop vs. Arrest</u>

"There is no bright-line rule to determine when an investigatory stop becomes an arrest." *Washington v. Lambert*, 98 F.3d 1181, 1185 (9th Cir. 1996). Courts look to the totality of the

circumstances and consider "both the intrusiveness of the stop, *i.e.*, the aggressiveness of the police methods and how much the plaintiff's liberty was restricted . . . and the justification for the use of such tactics, *i.e.*, whether the officer had sufficient basis to fear for his safety to warrant the intrusiveness of the action taken." *Id*. (internal citations omitted). The Court must ask whether law enforcement officer's actions during a stop "were reasonable *given the specific circumstances*." *Id*. (emphasis in original.)

Slade argues that although Sgt. Sigel had a basis to stop him and issue a civil infraction, Sgt. Sigel transformed the stop into an unlawful arrest by pointing his gun at Slade's head and restraining him. (Dkt. No. 19 at 7.) The Court disagrees. There is no doubt that Sgt. Sigel took intrusive measures during the stop. Sgt. Sigel not only drew his sidearm, but pointed it at Slade's head. *See United States v. Alvarez*, 899 F.2d 833, 838 (9th Cir. 1990) (holding that seriousness of stop is increased when police draw their firearms). Sgt. Sigel also pushed Slade up against his patrol car, thus physically restraining Slade's ability to leave. *See United States v. Del Vizo*, 918 F.2d 821, 824 (9th Cir. 1990) (removing suspect from his car and making him lie down in the street was a factor in whether an arrest had occurred).

Although intrusive, Sgt. Sigel's actions were reasonable under the specific circumstances he faced. As explained above, Sgt. Sigel did not draw his sidearm until after Slade refused to comply with Sgt. Sigel's commands to show his hands. Sgt. Sigel's articulable safety concern, brought on by Slade's repeated non-compliance, made it reasonable for Sgt. Sigel to respond by drawing his sidearm. *See United States v. Taylor*, 716 F.2d 701, 709 (9th Cir. 1983) (holding that no arrest had occurred where the police approached the suspect with guns drawn and handcuffed him after he twice refused to raise his hands and "ma[de] furtive movements inside the truck where his hands could not be seen."). Further, Sgt. Sigel did not point his sidearm at Slade's head until after Slade continued to reach for his right front waistband. As Sgt. Sigel's safety concerns increased with Slade's continued non-compliance, it was reasonable for him to respond by taking more aggressive measures to gain control of the situation.

The Court also finds that Sgt. Sigel's actions were closely tied to the objective of ensuring officer safety during an investigatory stop. *See Alexander v. County of L.A.*, 64 F.3d 1315, 1320 (9th Cir. 1995) (noting that in the course of a *Terry* stop, "[i]t is well settled that when an officer reasonably believes force is necessary to protect his own safety or the safety of the public, measures used to restrain individuals, such as stopping them at gunpoint and handcuffing them, are reasonable."). Sgt. Sigel repeatedly told Slade to show his hands, but Slade continued to reach for his right front waistband. All of Sgt. Sigel's subsequent actions—commanding Slade to show his hands, drawing and pointing his sidearm at Slade's head, and pushing Slade up against his patrol car—were directly related to stopping Slade from reaching for his waistband. Sgt. Sigel did not respond to Slade's non-compliance by putting Slade in handcuffs or placing him the back of the patrol car—steps that, under the circumstances, would have appeared calculated to effect an arrest rather than to diffuse Sgt. Sigel's safety concerns. Even Sgt. Sigel's *Terry* frisk was limited to the area of Slade's waistband where he had continued to reach despite Sgt. Sigel's commands.

In concluding that Sgt. Sigel did not transform the stop into an arrest, the Court also notes how quickly the encounter unfolded. Approximately two minutes passed between the time Sgt. Sigel approached Slade and the time Sgt. Sigel placed Slade in handcuffs. The testimony elicited at the hearing demonstrated that Sgt. Sigel was reacting quickly to what was an uncertain and fluid situation. Under the circumstances, the Court finds that the quickness of the stop further speaks to Sgt. Sigel's articulable concern for officer safety and is more reflective of a brief investigatory detention than an arrest.

For the foregoing reasons, the Court finds that Sgt. Sigel's actions, though intrusive, were reasonable under the circumstances and did not transform an investigatory stop into an arrest that lacked probable cause. Slade's motion to suppress is DENIED on this ground.

3.  <u>Excessive Force</u>

A police officer's use of excessive force can render a search unreasonable under the

Fourth Amendment. *United States v. Ankeny*, 502 F.3d 829, 836 (9th Cir. 2007). Where a search is unreasonable, courts then look to "whether there was a sufficient causal relationship" between the unreasonable action and the discovery of evidence such that the evidence should be suppressed. *Id.* at 837 (quoting *United States v. Ramirez*, 523 U.S. 65, 7 n.3 (1998)). In determining whether a police's officer use of force is unreasonable, courts balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal quotation marks omitted). The surrounding circumstances must be judged objectively from the perspective of a reasonable officer on the scene. *Deorle v. Rutherford*, 272 F.3d 1272, 1279 (9th Cir. 2001).

Slade asserts that Sgt. Sigel used excessive force by pointing his gun at Slade's head. (Dkt. No. 19 at 7.) Slade further asserts that Sgt. Sigel's conduct warrants suppression of the handgun. (*Id*.) Sgt. Sigel's use of force was reasonable given his articulable concern for officer safety. Given the surrounding circumstances, and Slade's continued non-compliance, a reasonable police officer in Sgt. Sigel's position would be warranted in drawing his sidearm and pointing it at Slade's head. For the same reasons that the Court concluded that Sgt. Sigel acted reasonably in conducting a *Terry* frisk and did not convert the stop into an arrest, the Court concludes that Sgt. Sigel did not use excessive force. Defendant's motion to suppress is DENIED on this ground.

### 4. Due Process

A police officer's use of brutal force that "shocks the conscience" violates substantive due process rights and warrants suppression. *See Rochin v. California*, 342 U.S. 165 (1952). Slade argues that Sgt. Sigel's use of force by pointing his gun at Slade's head was so brutal that it violated his due process rights. For the same reasons that the Court concluded that Sgt. Sigel acted reasonably in conducting a *Terry* frisk, did not convert the stop into an arrest, and did not use excessive force, the Court concludes that Sgt. Sigel's actions did not violate Slade's

substantive due process rights. Defendant's motion to suppress is DENIED on this ground.

### B. Motion to Dismiss Indictment

Slade separately argues that the Court should dismiss the indictment because Sgt. Sigel's conduct was so outrageous that it violated due process. (Dkt. No. 19 at 9.) Having found that Sgt. Sigel did not act unreasonably during the stop, the Court concludes that there is no basis to dismiss the indictment. Therefore, Slade's motion to dismiss the indictment is DENIED.

## III. CONCLUSION

For the foregoing reasons, Defendant's motion to suppress and motion to dismiss (Dkt. No. 19) is DENIED.

DATED this 23rd day of May 2019.

John C. Coughenour
UNITED STATES DISTRICT JUDGE